# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

TODD C. NISSEN,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C07-4056-MWB

**REPORT AND RECOMMENDATION**

---

## I.  INTRODUCTION

The plaintiff Todd C. Nissen seeks judicial review of a decision by an admini-strative law judge ("ALJ") denying his applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits.  Nissen claims the ALJ erred in giving improper weight to the various medical evidence and in assessing Nissen's residual functional capacity.  (*See* Doc. No. 10)

## II.  PROCEDURAL AND FACTUAL BACKGROUND
### A.  Procedural Background

On August 20, 2004, Nissen protectively filed applications for DI and SSI benefits, alleging a disability onset date of January 30, 2004.  (R. 63-66, 348-51).  Nissen claims he is disabled due to radiculopathy secondary to a herniated disc at L5-S1, and right sacroiliitis.  (R. 86)  He claims these conditions cause him pain when he walks long distances, stands for any period of time, walks up stairs, bends, twists, or sits.  He was working as a chicken house manager at an egg production plant when he was injured on January 29, 2004, and he claims he tried to return to his job duties at least a dozen times after the injury but "the pain was unbearable - the required walking distance was

impossible to do." He was unable to work a full day on any of the occasions when he tried to return to work. (R. 87, 378)

Nissen's applications were denied initially and on reconsideration. (*See* R. 31-33, 352-57) Nissen requested a hearing, and a hearing was held on August 10, 2006, before Administrative Law Judge ("ALJ") Robert Maxwell. Nissen was represented at the hearing by attorney Lindsay Beach. Nissen testified at the hearing, and Vocational Expert ("VE") Tom Audet also testified. (R. 258-88) On September 20, 2006, the ALJ found that although Nissen could not return to his past relevant work, he remained able to perform other jobs that exist in significant numbers in the national economy, and he therefore is not disabled. (R. 16-25) Nissen appealed the ALJ's ruling, and on May 25, 2007, the Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner. (R. 6-8)

Nissen filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 4) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Nissen filed a brief supporting his claim on November 12, 2007. (Doc. No. 10) The Commissioner filed a responsive brief on January 11, 2008. (Doc. No. 13) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Nissen's claim for benefits.

### B. Factual Background

### 1. Introductory facts and Nissen's hearing testimony

At the time of the hearing, Nissen was forty-three years old. He is 5'7" tall and weighs about 155 pounds. He is right-handed. He lives in a two-story house with a friend who works and pays the household expenses. Nissen has no income, but he receives $152

per month in food stamps. He completed the ninth grade, and later obtained his GED. (R. 362-63, 377)

Nissen last worked on January 29, 2004, when he fell and was injured on the job. He was working as a chicken house manager for Rembrandt Enterprises, a job he started in June 2002. In this job, he walked up and down aisles in a long building to look for dead chickens in cages. The job required him to stand for eight to ten hours per day, and to lift up to fifty pounds. He left the job after his injury. (R. 87, 363)

Before working at the chicken house, Nissen worked for three years loading and unloading trucks. He was on his feet for most of the eight-hour days, lifting between sixty and seventy pounds repeatedly during the day. (R. 364) Before that, he worked for a year[1] as a part-time welder making grease guns. He spent about half his time sitting and half standing, and lifted around fifty pounds regularly. (*Id.*) Before that, he worked for almost two years debeaking chickens, and loading and unloading chickens. The job required him to lift thirty to forty pounds regularly. (R. 100) Before that, he did landscaping work for five years, digging and planting trees and shrubs and driving a tractor. This job also required him to lift thirty to forty pounds regularly. (R. 101) And before that, he worked for about ten years doing construction of grain bins and steel buildings. The job required him to lift 100 pounds or more on occasion, and fifty pounds or more frequently. (R. 102)

Nissen experiences the most pain in his low back and his SI joint, which he understands to be "where your pelvis attaches to your low back." (R. 365) He has continuous pain in that area which worsens when he steps down on his right leg. He describes the pain as "stabbing and shooting," and rates the pain at a "[f]our or five" on a ten-point scale. (R. 365-66) The pain also worsens when he sits for ten to twenty

---

[1] Although he held the job for a year, he actually only worked for a few months because he was laid up from an automobile accident for several months. (R. 378)

minutes.  (*Id.*)  He had surgery on his low back that relieved his low back pain somewhat, and almost completely relieved his leg pain.  (R. 375-76)

Nissen also has constant pain in his neck that is similar to the pain in his lower back.  According to Nissen, an MRI exam revealed that he has "two protruding disks in [his] neck that are pinching nerves . . . in the C6 and C7 area."  He rated his neck pain at "[a]bout a three or a four" on a ten-point scale.  (R. 366)  He underwent a few weeks of physical therapy for his neck sometime in 2005.  (R. 374)

Nissen also has pain in his mid back.  This pain is "not as severe, but it's constant, kind of like a shooting, sharp, shooting pain."  (R. 366)  He also has pain that begins at the base of his neck and goes out to his shoulders, on both sides.  He described this as "a kind of a mild, shooting pain," and he rated the pain at "about a two" on a ten-point scale.  (R. 368-69)

At the time of the hearing, Nissen was taking a short course of hydrocodone for his pain.  He stated the medication took "some of the edge off" but did not relieve his pain.  He started taking the hydrocodone on July 3, 2006, when he went to the emergency room for "major spasms and pain in [his] SI joint region in [his] low back," that occurred when he was watering some trees and plants in his backyard.  (R. 367, 373)  To relieve his pain, Nissen alternates between sitting and standing all day long.  He estimated he can sit for fifteen to twenty minutes at a time and stand for up to thirty minutes at a time before the pain gets severe enough that he has to change position and move around.  After he has been standing for about half an hour, he gets pain and burning in his feet, and he lies down to relieve the pain.  (R. 369)  He normally uses a cane if he has to walk more than 100 feet or so, and he estimated he could walk "maybe a block or two at the most" using his cane.  (R. 370, 374)  According to Nissen, the cane was prescribed for him by a doctor in about 2004.  (R. 373-74)  After he walks a short distance, the pain in his low back and SI joint becomes more severe.  He is unable to bend over and touch his toes without bending his

knees, and squatting causes him "extreme pain." (R. 370)  According to Nissen, a doctor has given him a ten-pound lifting restriction, and he tries not to exceed that limit.  (*Id.*)

Nissen also has headaches three or four times a week, which he attributes to his "pinched nerves."  He described his headaches as "very severe headaches, what probably most people refer to as migraine."  (R. 368)  The headaches last as long as a day or two. He takes Ibuprofen 800 mg. for the headaches, and then he lies down until the pain goes away.  Nothing in particular seems to bring on the headaches; "[t]hey just come on anytime whenever they want."  (*Id.*)

Nissen has good days and bad days.  On a bad day, he lies down for longer periods of time, limits his movement, and "just take[s] it easier than [he] normally would." (R. 371)  He generally lies down "a dozen or more" times during the day, not to sleep but just to rest in a prone position for about half an hour.  On a normal day, he gets up in the morning, has a cup of coffee, watches some television, and does some reading.  He alternates between sitting and standing throughout the day.[2]  By 5:00 to 6:00 in the evening, he feels "just completely exhausted like I have worked an entire day[.]"  (R. 371-72)  A friend accompanies him when he goes grocery shopping, and Nissen does his own cooking.  He does dishes once or twice a week.  (R. 372)

Except for his emergency room visit, Nissen last saw a doctor in about May 2005. He does not see a doctor regularly because, according to him, he has been told there is nothing doctors can do for his condition.  He stopped taking prescription medications in 2005, because he could not afford them.  (R. 373)

The ALJ asked Nissen about a functional capacity evaluation he had in 2005, where the physical therapist opined he had not put forth his best effort.  Nissen stated he "tried the best that [he] could with what [he] had to work with."  (R. 376-77)

---

[2]The court notes Nissen asked the ALJ for permission to stand up during the hearing.  (R. 372)

Nissen does not believe he can do any type of work, even part-time. According to him, his doctor told him that he is "not a very good candidate for fulltime employment" due to his work restrictions. (R. 379)

Nissen had some previous worker's compensation claims involving his low back and mid back before the injury leading to his current problems. He indicated he was diagnosed with fibromyalgia by a doctor at the University of Iowa Hospitals and Clinics, sometime around 1995. (R. 379-80)

## 2. Nissen's medical history

On January 29, 2004, when Nissen was forty years old, he fell on a slick floor at work and injured his right hip. He experienced some pain in his lower back on the right, but the injury was not considered to be serious. His family doctor, David Archer, M.D., treated him with Naprosyn and Trazodone. (R. 241) Nissen also reported pain in his mid back, especially on the right, and sometimes extending down into his gluteal region and thigh. He declined an injection because "[h]e doesn't like needles," although Dr. Archer thought "it would be really helpful for him." (R. 241) On February 19, 2004, Nissen underwent a limited bone scan to rule out a hip fracture, and the bone scan was normal. (R. 166) Nissen saw Dr. Archer on February 23, 2004, and reported that although he was doing physical therapy exercises and taking his medications, his symptoms were no better. He again declined an injection. The doctor noted Nissen "[h]obble[d] about the room in a somewhat less than believable pattern." (R. 240)

Nissen underwent an MRI on February 24, 2004, that showed "L4-5 degenerative disc disease with posterior bulging anulus [sic]"; "L5-S1 degenerative disc disease with disc protrusion lateralizing to the right without compelling evidence of spinal stenosis or nerve root impingement;" and "High and low intensity changes and irregular bony thickening associated with right lamina L3 of indeterminate etiology. Considerations

6

include developmental, post traumatic change, or bone growth." (R. 168; *see* R. 169) The radiologist recommend evaluation of "the L3 right sided posterior element changes," with a possible "CT of the lumber spine with multiplanar reconstruction." (R. 168) The doctor noted the L5-S1 disc protrusion was "touching upon but not displacing or compressing on the right intrathecal S2 nerve root," with similar findings with regard to the L4 nerve root. (R. 169) He suggested Nissen see a neurologist if he continued to have concerns about his back. (*Id.*)

Nissen attended ten physical therapy sessions from February 4, 2004, through March 1, 2004, with "no relief of his right hip pain." (R. 180; *see* R. 181-99) He continued to have significant pain, causing him difficulty working. He saw Dr. Archer on March 3, 2004, and again declined an injection. He also declined an epidural flood, again due to his fear of needles. The doctor felt there was a " substantial am[oun]t of psychological overlay" connected with Nissen's symptoms. (R. 240) Nissen indicated his pain increased after his physical therapy sessions, so Dr. Archer discontinued the physical therapy. The doctor noted Nissen got up from a chair "with great groaning and fanfare." (*Id.*) Naprosyn and Trazodone were continued for pain, and the doctor recommended a neurology consult. (*Id.*)

Nissen returned to see Dr. Archer on March 8, 2004, complaining of pain radiating down his right leg, and numbness in all five toes on his right foot. He also complained of sharp pain at the end of his tailbone, and his arms were beginning to shake. The doctor noted Nissen's symptoms were worsening without any physiologic explanation. He noted Nissen stated he "cannot possibly work." (R. 239) Dr. Archer wrote a prescription for seated work only, and noted Nissen was scheduled for a neurology consultation in the near future. (*Id.*)

On April 10, 2004, Nissen went to the emergency room with a complaint of worsening back pain, and numbness in his right foot. Hospital records indicate he had

fallen in the men's room while he was playing Bingo. He was treated with an injection of Toradol and was given a prescription for Flexeril, with instructions to follow up in two to three days with his family doctor. (R. 170-74) He saw Dr. Archer for follow-up on April 12, 2004. The doctor noted Nissen had been released by the neurologist, who was unable to find anything wrong with Nissen's back. Nissen had obtained a consult at the University of Iowa Hospitals and Clinics and, according to Dr. Archer's notes, the hospital's only recommendation was for Nissen to return to physical therapy. On examination on this date, Nissen expressed great discomfort and "posturing" while standing, but he was able to lie flat on the exam table, which the doctor noted was inconsistent with Nissen's standing posture. The doctor opined "Nissen's complaints far exceed[ed] his physical findings," and it was appropriate for him to return to work. (R. 239) The doctor gave Nissen a "sit/stand" work restriction, but indicated Nissen was "certainly safe to return to work otherwise." (*Id.*)

Nissen returned to see the physical therapist on April 12, 2004, for further evaluation. At that time, Nissen was noted to "ambulate[] with stooped posture with significant limp with decreased stance time on the right lower extremity compared to the left." (*Id.*) Nissen stated he was unable to stand up straight, although he was able to lie flat on his back and on his stomach. On testing, he exhibited some limited ranges of motion. He reported pain with weight-bearing activities, and radicular pain into his right thigh with radicular numbness into the right toes. He attended three physical therapy sessions a week for two weeks, but reportedly experienced increased pain for a couple of days after each session. (*See* R. 175-80; 203-07)

Nissen saw Dr. Archer again on April 13, 2004, stating he did not understand his work restrictions. He complained that Dr. Archer, Dr. Palit, and the University of Iowa doctor all had examined him and arrived at different conclusions, but Dr. Archer disagreed, stating all three had concluded Nissen's pain was myofascial in nature, he had

no nerve root injury, he was not a surgical candidate, and "his pain behavior [was] way out of proportion to his physical findings and the nature of his injury." (R. 238) Nissen's worker's comp carrier determined that his previous injury had been exacerbated by the fall in the men's room at Bingo, and they declined ongoing coverage. Dr. Archer prescribed some additional physical therapy sessions, and he released Nissen to work for six hours per day with a twenty-pound lift-push-pull limitation for two weeks, after which he planned to close the worker's compensation case. (*Id.*)

On May 4, 2004, Nissen saw Daniel G. Tynan, M.D., a neurosurgeon, for an evaluation. Dr. Tynan noted Nissen's lumbar range of motion was "limited in all directions" due to frequent back spasms, radiating around his right flank. He opined Nissen's pain was due to an annular tear at L5-S1 and underlying disc bulge. He encouraged Nissen to continue with conservative treatment, and referred him to a physical medicine and rehabilitation physician. He advised Nissen it could take several months for his pain to subside, and indicated he would have to "accept a certain amount of pain so that he [could] return to work." (R. 201) He also advised Nissen it was unlikely he would ever be completely free of pain. Dr. Tynan instructed Nissen to remain off work until he was seen by the physical medicine and rehabilitation specialist. (R. 200-02)

Nissen saw Dr. Archer on May 7, 2004, for follow-up. Nissen again refused an epidural flood or similar treatment options, and Dr. Archer indicated he had nothing more to offer Nissen. He released Nissen for full-time work. (R. 238)

On June 3, 2004, Nissen was seen in the emergency room complaining of "excruciating pain, unable to walk, screaming in pain, . . . complaining of spasms going down his right leg." (R. 209) He was treated with intravenous Toradol with no results. He then was treated with 1 gram of Rocephin, with an immediate reduction of his pain. He was taken off work for a couple of days, and received a prescription for Robaxin for muscle spasms. (R. 208-12)

On June 10, 2004, Nissen saw David Crippin, M.D. for "another opinion." Dr. Crippin indicated Nissen had a "[q]uestionable annular tear [in the] L5-S1 disc area." He referred Nissen to neurosurgeon Michael J. Giordano, M.D. for evaluation, but was unable to get Nissen an appointment until July 22, 2004. Dr. Crippin directed Nissen to stay off work until he saw Dr. Giordano. (R. 233)

Nissen was able to see Dr. Giordano sooner than anticipated, on July 1, 2004. The doctor diagnosed "Right S1 right radiculopathy secondary to herniated disc at L5-S1"; and "Right sacroiliitis." (R. 258) The doctor opined Nissen's symptoms were the result of his fall at work. Dr. Giordano recommended surgery, and Nissen indicated he would discuss the matter with his worker's comp carrier and make a decision. The doctor further recommended that if Nissen did not undergo surgery, he should receive epidural steroid injections in his lumbar spine and right SI joint. (R. 258-59)

Nissen was admitted for surgery on September 1, 2004, and Dr. Giordano performed a right L5-S1 microsurgical diskectomy. Percocet was prescribed for post-operative pain, and Nissen was directed to follow up with his doctor in four to six weeks. He was directed not to return to work until released by his doctor. (R. 213-16) Nissen saw Dr. Giordano on September 30, 2004, for follow-up. He stated his back pain and right leg pain were much better. However, he complained of increasing pain in both the right and left sacroiliac joints, greater on the right. Nissen asked the doctor "about disability." (R. 256) Dr. Giordano referred Nissen to the Mercy Pain Clinic for treatment of his sacroiliitis. He prescribed Neurontin for Nissen's complaint of "foot burning." He noted Nissen had "been discharged from his former job," and he was "not yet able to return to work." (*Id.*)

On November 2, 2004, a physician (whose signature is illegible) reviewed the record on behalf of Disability Determination Services and completed a Physical Residual Functional Capacity Assessment form. (R. 147-54) The evaluator opined Nissen could

lift twenty pounds occasionally and ten pounds frequently; sit, and stand/walk, for about six hours each in a normal workday; and push/pull without limitation. He found Nissen did not have any additional postural or other limitations. He observed that Dr. Giordano's notes indicated Nissen "was doing relatively well" since his surgery, "walking and doing some home-type therapy," with "full strength in the lower extremity and good strength on plantar flexion." (R. 148-49) The doctor further noted Nissen performed his own self-care, and was able to do "some light household chores." (R. 149) The evaluator opined Nissen would be capable of the indicated functional abilities "by January 2005, 12 months after his [alleged onset of disability]." (R. 152)

Nissen saw Dr. Crippin on November 26, 2004, complaining of neck pain, ear irritation and pain, and sacroiliac irritation and strain. The doctor prescribed Amoxicillin. (R. 230)

Nissen returned to see Dr. Giordano on November 30, 2004. Nissen had not been to the Mercy Pain Clinic because he had no insurance and had lawsuits pending regarding his worker's comp coverage. He continued to complain of pain in the region of the right SI joint, especially when weight-bearing. Dr. Giordano continued to believe Nissen's "need for surgery was related to his injury at work," and he offered to provide whatever support he could for Nissen's worker's comp claim. He again indicated the best course of treatment would be through the Pain Clinic. (R. 255)

Nissen saw Dr. Crippin on December 1, 2004. He complained of increased pain, and indicated he had been unable to afford to fill his prescriptions for pain medications. There was still some question about what his worker's comp carrier was going to cover. He agreed to an injection, and received an injection of Toradol. Dr. Crippin gave him some samples of Ultram, and he ordered an MRI. He also scheduled an epidural flood on the right sciatic area. Nissen also complained of some vision and hearing problems, and he was scheduled to see other specialists to evaluate those complaints. (R. 229)

An MRI study on December 3, 2004, showed some post-surgical residual scar tissue in the epidural space, but no resulting compression of the thecal sac or adjacent nerve roots. The MRI continued to show "L4-5 and L5-S1 degenerative disc disease." (R. 217) Due to ongoing right-sided radicular symptoms, an MRI also was performed of Nissen's cervical spine. The study showed "C5-6 degenerative disc disease with broad base subligamentous disc protrusion without compelling evidence of cord or nerve root compression"; and "C6-7 broad base disc protrusion lateralizing to the right more than the left with what appears to be compression of right intrathecal C7 nerve root." (R. 218)

On December 7, 2004, Dr. Giordano called Dr. Crippin to discuss Nissen's case. Dr. Crippin indicated the following in his notes from the call:

> Dr. Giordano is concerned that [Nissen] was not following up on recommendations for epidural flood or SI block on the right side. In Dr. Giordano's opinion, [Nissen] was making his disability last longer and avoiding [treatments] which would work and he is using excuse of insurance reimbursement and coverage to justify his behavior, however, in fact the several places in Sioux City have offered to do the injections and work out payments at a later date. Dr. Giordano did feel that there is certainly some secondary gain issues going on here in light of his hesitancy to get intervention that might actually help him.

(R. 229)

On December 15, 2004, Nissen appeared at Dr. Crippin's office to talk with the nurses. Notes indicate Nissen was confused as to why the doctors he had seen for his hearing problem would not address his neck pain or review his MRI results. He stated his hearing was somewhat better. The nurses explained to Nissen that those doctors were ear, nose and throat specialists, not orthopedic specialists, and they advised Nissen to follow Dr. Giordano's recommended treatment of epidural floods to relieve his back pain. (*Id.*)

On December 17, 2004, Nissen saw Dr. Crippin, indicating he finally was willing to have injections in his sacroiliac area and to obtain the epidural flood. He complained

of neck pain radiating down both arms and also into the occipital area. The doctor noted Nissen was "wound pretty tight as far as nerves and pain." (R. 228) He evidenced limited ranges of motion of his back and somewhat of his neck, paracervical muscle spasms bilaterally, and tenderness in the trapezius, right occipital nerve area, and in his back down to his buttocks. Dr. Crippin diagnosed back strain with ongoing disc disease, muscle spasms, and "C6-7 disc." (*Id.*) He encouraged Nissen to follow through with the injections and epidural flood, noting it seemed "[k]ind of silly to have ongoing severe pain and then not follow up with the recommendations to fix it." (*Id.*)

On December 27, 2004, Dr. Crippin's office received a call from the Mercy Pain Clinic indicating Nissen had cancelled his appointment that had been scheduled for December 29, 2004. Notes indicate everything had been cleared financially, but Nissen stated he was "not going to go through with it." (*Id.*) Dr. Crippin indicated he would not see Nissen again for back and neck problems, but he would continue to see him for other medical problems. (*Id.*)

On February 1, 2005, Nissen returned to see Dr. Giordano for follow up of his sacroiliitis and right-sided hip pain. He stated he was fearful of having injections, but the doctor indicated that was his only treatment recommendation for Nissen. (R. 253)

On February 7, 2005, Nissen saw Intikhab Mohsin, M.D. at the Mercy Pain Clinic on referral from Dr. Giordano, for evaluation and treatment of lower back pain which had begun to worsen. Nissen described his pain as mostly on the right side with some crossing to the left side. He indicated that at best, his pain was at a level of five on a ten-point scale, and at worst, it was ten on a ten-point scale. Dr. Mohsin administered bilateral sacroiliac joint injections with a steroid and local anesthetic. The doctor indicated that in view of Nissen's "limited range of motion during back extension," a lumbar facet joint injection might be indicated in the future if Nissen did not obtain satisfactory results from the SI joint injections. (R. 219-20)

The day following the injections, Nissen saw Dr. Crippin with complaints of nausea, vomiting, and feeling flushed in his face. Notes indicate Nissen was "quite anxious which is not unusual for him." (R. 228) He continued to have lower back pain and problems with activity. The doctor diagnosed possible influenza and mild dehydration. Nissen was sent to the emergency room for IV fluids, and he reported feeling better afterwards. He was sent home with samples of Prevacid. (*Id.*)

About three months later, on May 3, 2005, Nissen saw Dr. Giordano for follow-up. He continued to complain of pain in the region of his right hip and SI joint. He had no radiating pain into his leg, but stated he would have some numbness in his hip region if he sat for any prolonged period. He continued to display tenderness over the greater trochanter and the SI joint. Dr. Giordano supported Nissen's plan to obtain an independent medical evaluation for disability purposes. He prescribed some Elavil at night for pain, and directed Nissen to follow up with Dr. Crippin as needed. (R. 252) He also gave Nissen a prescription for a permanent handicapped parking sticker, noting Nissen was "unable to walk 200 feet unassisted." (R. 251)

On May 13, 2005, Dr. Giordano completed a Spinal Impairment Questionnaire. (R. 244-50) He listed diagnoses of "sacroliliitis chronic" and "s/p lumbar discectomy with chronic back pain." (R. 244) Under the Prognosis section of the form, the doctor indicated, "Poor for full time employment but overall prognosis for independent living is good." (*Id.*) Dr. Giordano listed the following clinical findings supporting his opinions:

▸ Limited range of motion in the lumbar area, "limited to no repetitive bending, stooping or standing more than 30 minutes at a time."

▸ Tenderness "in sacro-illiac [sic] joint region on Right"

▸ Occasional muscle spasms in the lumbar area of his back

▸ Sensory loss - "numbness [in] right leg when sitting for prolonged periods"

- Muscle weakness in the lumbar area - "with repetitive motion becomes weak with pain"
- Abnormal gait - "antalgic"
- Trigger points at the right SI joint.

(R. 244-45) The doctor noted Nissen's primary symptoms to be "pain in SI joint as described," and he indicated Nissen's symptoms and functional limitations were reasonably consistent with his physical findings. He described Nissen's pain as "aching, sometimes burning," and its frequency as "most of the day." (R. 246) He indicated Nissen's pain would be precipitated by "any prolonged standing or sitting. Activity such as lifting, bending . . ." (R. 247)

Dr. Giordano indicated Nissen would have the following permanent work restrictions: Sit for one hour, and stand/walk for two hours in an eight-hour day; medically-recommended that he not sit continuously, or stand/walk continuously, in a work setting; need to get up and move around every twenty to thirty minutes for ten minutes each time; lifting and carrying limits of ten pounds occasionally, with no lifting or carrying over ten pounds, and no frequent lifting or carrying of any weight. He listed Nissen's current medication as Elavil 25 mg. at bedtime. He opined Nissen's pain frequently would be severe enough to interfere with his attention and concentration, and he opined Nissen's symptoms would last more than twelve months. He further indicated emotional factors did not contribute to the severity of Nissen's symptoms and functional limitations. (R. 247-28) He indicated Nissen is not a malingerer, and opined Nissen could tolerate only low stress in the workplace, indicating Nissen "seems very focused on his pain, somewhat anxious and nervous." (R. 249) He opined Nissen would require ten to twenty unscheduled breaks of five to ten minutes each to rest during a normal workday. He further indicated Nissen could not do a full-time, competitive job that required him to keep his neck in a constant position. He indicated Nissen's condition would produce "good days" and "bad days,"

and he opined Nissen would be absent from work more than three times a month. (*Id.*) He recommended Nissen never push, pull, kneel, bend, or stoop, and he should not do any prolonged sitting or standing. (R. 250)

Dr. Giordano indicated Nissen's symptoms and limitations dated from the time of his injury on January 29, 2004, and he opined, "I do not believe that given this patient's overall chronic pain syndrome (likely has fibromyalgia as well but not confirmed) he will []ever return to any gainful employment." (*Id.*)

On June 3, 2005, Dennis A. Weis, M.D. reviewed Nissen's records and completed a Physical Residual Functional Capacity Assessment form. (R. 155-62) His findings were consistent with those of the earlier evaluator (*see* R. 147-54), except that Dr. Weis found Nissen could perform all postural activities "occasionally," whereas the previous evaluator found no limitation in Nissen's ability to perform postural activities.

On June 15, 2005, Peter D. Wirtz, M.D., an orthopedic surgeon, examined Nissen and reviewed his medical records from January 30, 2004, through May 3, 2005. (R. 260-63) The examination apparently was done in connection with Nissen's worker's comp case. Notes indicate Dr. Crippin had continued Nissen's medications and "advice as to cane and no work activities." (R. 261) Nissen walked with a cane in his right hand and used it for assistance in weight-bearing on his right leg. He exhibited "decreased feeling to touch over toes 1 and 5 right foot and the lateral thigh." (*Id.*)

In Dr. Wirtz's opinion, Nissen's clinical examinations prior to the time he first saw Dr. Giordano "did not reveal a condition indicating need for partial discectomy with laminectomy." (R 263) He further opined the degenerative disc condition that resulted in the surgery was not caused by Nissen's January 30, 2004, injury. In the doctor's opinion, Nissen would have no permanent impairment or work restrictions if he had not had the surgery, but due to the surgical procedure, he opined Nissen has a 10%

impairment of the body as a whole. He indicated the assignment of any permanent work restrictions would require a functional capacity evaluation. (*Id.*)

On July 15, 2005, Douglas W. Martin, M.D. saw Nissen for an independent medical examination, and he also reviewed Nissen's medical records. (R. 264-76) Dr. Martin's report indicates Nissen had undergone another independent medical examination on March 10, 2005, by Dr. Palit, who concluded, similarly to Dr. Wirtz, that Nissen's surgery "was not medically appropriate." (R. 267) The report from Dr. Palit's evaluation does not appear to be part of the administrative record.

Dr. Martin observed that Nissen used a cane in his right hand for ambulation. He noted Nissen "was able to get on and off the examination table with some minor difficulties." (R. 269) The doctor attempted to perform range of motion testing, but was unable to complete the testing due to Nissen's "considerable pain responses and behaviors as well as his inability to make a reasonable attempt at extension and flexion even with six multiple trials without consistency[.]" (R. 270) The doctor concluded the results of the range-of-motion testing were invalid. (*Id.*) Other examination procedures also elicited "rather vociferous moaning and groaning" from Nissen. (*Id.*) According to Dr. Martin, Nissen exhibited "[s]ymptom magnification [and] inappropriate illness behavior." (R. 271) He indicated Nissen's prognosis was poor, and he suggested neuropsychological testing might be helpful in determining the cause for Nissen's "degree of symptom magnification and inappropriate illness behavior[.]" (*Id.*)

Dr. Martin opined it would not be beneficial for Nissen to have a functional capacity evaluation "because of the significant likelihood that it would be an invalid test." (R. 272) Similar to the other medical evaluators, Dr. Martin opined Nissen's back surgery had not been medically indicated. (*Id.*) He opined Nissen has a 7% impairment to the whole person, and he opined Nissen "has reached a degree of maximum medical improvement

for his low back issues." (R. 273) Dr. Martin concluded as follows regarding Nissen's functional abilities, "within a reasonable degree of medical certainty/probability":

> From a purely functional standpoint and evidence-based standpoint, this gentleman should be able to return to work, at a minimum, in a light physical demand classification of 20 pounds material handling. His true capabilities for work can only be left to conjecture, but in my opinion are probably higher than that.
>
> Again, this gentleman's significant symptom magnification does play a role.

(*Id.*)

On August 18, 2005, Nissen underwent a functional capacity evaluation ("FCE") by Terry Nelson, PT, of Human Performance Testing. (R. 277-338) Nissen was unable to compete the entire evaluation, and he "elected to self-limit all activities throughout the entire [FCE]," with the result that the evaluation did not reflect his functional abilities accurately. (R. 277) He presented "with notable signs of holding, splinting, guarding postures of the trunk or lower extremities," which "appear[ed] to improve with distraction." (*Id.*) He similarly exhibited "holding, rigid postures of the entire trunk, and exaggerated movement patterns during gait activities, . . . [which] improve[d] with distraction." (R. 278) His trunk movements also were noted to be inaccurate due to exaggerated guarding, and his movement improved with distraction. (*Id.*) Overall, the evaluator indicated the results of the FCE were invalid and, at best, indicated Nissen's "minimal level of function." (R. 284) Those minimal functional levels included the ability to perform all types of postural activities occasionally; to sit and stand more than 66% of the workday; to walk occasionally during the workday; and to perform simple grasping, firm grasping, pushing/pulling, and lifting/carrying activities with his hands. (R. 279-82) "Nissen's overall strength profile [was] 1%, a poor strength profile," which the evaluator found indicated "sub-maximal effort" and an invalid validity profile. (R. 282-83) He

opined Nissen was able to work, but he was unable to classify the physical demand levels at which Nissen could work.  (R. 284)

Following completion of the FCE, Nissen went to the emergency room complaining of pain and tenderness in his low back extending down to his knee.  (R. 340-47)  He was treated with an injection of Demerol, Phenergan, and Robaxin, and half an hour later, he stated his pain felt much better.  He was discharged with instructions to follow up as needed with his family doctor.  (*Id.*)


### 3.    *Vocational expert's testimony*

The ALJ asked VE Tom Audet to consider an individual of Nissen's age and with his education and work history.  If Nissen's testimony regarding his limitations were credited and found to be fully factual, the VE stated he would be unable to return to any of his past work and would not be able to perform any other work.  The VE explained:

> The primary reason is that he's got a ten pound lifting restric-
> tion and he's not capable of holding a position either sitting or
> standing long enough to do any productive work.  He alter-
> nates sitting, standing and he's laying down, I think, on bad
> days almost all day, and then even on an average day he's
> laying down throughout much of the day or off and on
> throughout the day, so he is not capable of fulltime continuous
> employment.

(R. 384-85)

The ALJ based his second hypothetical question on the records review done by the State agency consultant Dr. Weis.  (*See* R. 155-63)  He asked the VE to consider the same individual as far as age, education, and work experience, with the following limitations:

> This time assume a person could occasionally lift and carry 20
> pounds, frequently ten pounds.  Could stand or walk or sit
> with normal breaks about six hours of eight.  Push/pull is
> unlimited.  Postural activities are occasional.  No manipula-
> tive, visual, communicative or environmental limits.  Could

such a person in your vocational opinion perform any of the claimant's past jobs, either as he did them or as they are defined in the <u>Dictionary of Occupational Titles</u>?

(R. 385)  The VE responded that the individual could return to Nissen's past work as a "poultry de-beaker," which is defined as light work in the DOT, but he could not perform the job as Nissen performed it.  (*Id.*)  He further indicated the individual could perform the full range of light, unskilled work.  (R. 385-86)

The ALJ asked the VE a third hypothetical question based on the Spinal Impairment Questionnaire completed by Dr. Giordano in May 2005.  (*See* R. 244-50)  The ALJ included the following limitations in this hypothetical question:

> If you assume a person is limited in an eight-hour day to sitting one hour, standing and walking two hours, would need to get up and move around every 20 to 30 minutes for ten minutes, is neither able to sit []or stand continuously, would be limited to occasional lifting of ten pounds with no lifting above ten pounds, are there any fulltime, and carrying is the same.  Are there any fulltime occupations that would . . . be consistent with that?

(R. 386)  The VE responded that this individual could not perform any full-time work.  (*Id.*)

### 4.    *The ALJ's decision*

The ALJ found Nissen had not engaged in substantial gainful activity since his alleged disability onset date of January 30, 2004.  He found Nissen has severe impairments consisting of "degenerative changes of the cervical and lumbar spine, status post discectomy and sacroiliac joint tenderness," but further found his impairments, singly or in combination, do not equal a listed impairment.  (R. 18-19)

The ALJ found Nissen "has the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently, stand, and/or walk up to 6 hours in an 8 hour

workday with normal breaks and sit for up to 6 hours in an 8 hour workday with normal breaks. In addition he is limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling." (R. 19) He found Nissen's subjective complaints regarding his limitations not to be fully credible, noting Nissen "testified to a great degree of physical limitation which is not supported by the evidence of record." (R. 20-21) The ALJ noted Nissen's treating sources have indicated that he exhibited exaggerated pain behaviors and made inconsistent complaints on several occasions, and his poor effort on objective testing has prevented evaluators from reaching valid conclusions regarding his functional capacity. In addition, treating and examining sources have found no clinical explanation for many of Nissen's subjective complaints. (R. 21-23)

The ALJ further noted Nissen takes no prescribed medications for pain. Although Nissen indicated he did not fill prescriptions due to lack of funds, the ALJ found no evidence that treating sources had prescribed pain medications for him "other than a short course of hydrocodone following surgery." (R. 23) Nissen also testified he has frequent migraine headaches, but the ALJ found no record evidence that Nissen ever has been evaluated or treated for migraines. (*Id.*) Nissen takes only Ibuprofen for pain, and he last saw a doctor in May 2005, further undermining his allegations. The record indicates that Nissen exhibited positive Waddell's sign repeatedly, which the ALJ noted "is indicative of symptom magnification." (*Id.*) Considering the record as a whole, the ALJ found Nissen "credible only to the extent that he is limited to the residual functional capacity found above." (*Id.*)

The ALJ discounted Dr. Giordano's opinion[3] that Nissen could only work at less than a sedentary level because the ALJ found this opinion to be inconsistent with the doctor's own records and the other objective medical evidence of record. (*Id.*) He found

---

[3] In the ALJ's decision, he erroneously indicates this opinion (*see* R. 244-59) was given by a "Dr. Crichton." (R. 23) This error does not affect the ALJ's decision or the court's review.

the assessments by the state agency consultants and the report from the functional capacity evaluation to be more reflective of the evidence as a whole. (*Id.*)

The ALJ concluded Nissen is unable to return to any of his past relevant work, but he can perform other jobs that exist in significant numbers in the national economy. Based on Nissen's RFC, the ALJ concluded Nissen can perform the full range of light work. (R. 24) He therefore found Nissen was not disabled at any time from January 30, 2004, through the date of the decision (i.e., September 20, 2006). (R. 24-25)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the

claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving

Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221

F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1) the claimant's daily activities;
2) the duration, frequency and intensity of the pain;
3) precipitating and aggravating factors;
4) dosage, effectiveness and side effects of medication;
5) functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. DISCUSSION

Nissen argues the ALJ failed to give proper consideration to Dr. Giordano's opinions, and gave inappropriate weight to the opinions of the State agency consultants. He further argues the ALJ substituted his own medical knowledge for that of Nissen's treating source in determining Nissen's RFC, and the RFC found by the ALJ is not supported by substantial evidence in the record. *See* Doc. No. 10, pp. 6-15. The Commissioner responds by arguing the ALJ properly found that Nissen had exaggerated his symptoms, and his subjective complaints were not totally credible. He argues the ALJ gave proper weight to Dr. Giordano's opinion and to the opinions of the State agency consultants and other medical sources. *See* Doc. No. 13, pp. 12-19.

The weight an ALJ gives to the opinions of medical sources is well settled in both case law and the regulations. As the Eighth Circuit has explained:

"A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight

to or rejecting the statements of a treating physician. *See* 20
C.F.R. § 404.1527(d)(2). Whether the ALJ gives great or
small weight to the opinions of treating physicians, the ALJ
must give good reasons for giving the opinions that weight.
*Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001).
"The ALJ may discount or disregard such an opinion if the
other medical assessments are supported by superior medical
evidence, or if the treating physician has offered inconsistent
opinions." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir.
2001). Moreover, a treating physician's opinion does not
deserve controlling weight when it is nothing more than a
conclusory statement. *Piepgras v. Chater*, 76 F.3d 233, 236
(8th Cir. 1996). *See also Thomas v. Sullivan*, 928 F.2d 255,
259 (8th Cir. 1991) (holding that the weight given a treating
physician's opinion is limited if the opinion consists only of
conclusory statements).

*Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008). A treating physician's opinion
ordinarily is accorded special deference, but it may be discounted or even disregarded
"where a treating physician renders inconsistent opinions that undermine the credibility of
such opinions[.]" *Prosch v. Apfel*, 210 F.3d 1010, 1012 (8th Cir. 2000).

In the present case, the ALJ discounted Dr. Giordano's opinion regarding Nissen's
functional limitations because the ALJ found the doctor's opinion to be inconsistent both
with his own records and with the other medical evidence of record. *See* R. 23. The court
agrees Dr. Giordano's opinions are inconsistent with the opinions of every other physician
who examined or treated Nissen. Nissen's other treating and examining sources all noted
that Nissen exhibited a marked degree of symptom exaggeration. Even Dr. Giordano
indicated to Dr. Crippin that he believed Nissen had "some secondary gain issues"
evidenced by Nissen's reluctance to undergo treatment modalities that could prove
beneficial to him. Significantly, two independent examining sources opined that Nissen's
condition did not demonstrate a medical need for the surgery Dr. Giordano had
recommended and performed, and they opined Nissen's permanent condition actually was

made worse as a result of the surgery. Nissen's ongoing refusal to follow through with his treating physicians' treatment recommendations undermines the credibility of his subjective complaints. *See Rankin v. Apfel*, 195 F.3d 427, 429 (8th Cir. 1999) (citing *Harwood v. Apfel*, 186 F.3d 1039, 1045 (8th Cir. 1999); *Black v. Apfel*, 143 F.3d 383, 386-87 (8th Cir. 1998)).

The court finds the ALJ did not err in the weight he gave to the various medical opinions in the record. Furthermore, to the extent the record presents an inconsistent picture of Nissen's condition, the court must affirm the Commissioner's decision if one position that can be drawn from the inconsistent evidence represents the agency's findings. *Roe*, 92 F.3d at 675. Such is the case here. For these reasons, the court finds the Commissioner's decision that Nissen is not disabled should be affirmed.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[4] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be affirmed.

**IT IS SO ORDERED.**

**DATED** this 9th day of May, 2008.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[4] Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.